Good morning, Counsel. Good morning, Your Honors. May it please the Court, Gregory Joseph for the appellant. Your Honors, the District Court found that the CEO of Qualcomm, Mr. Mollenkamp, lied on January 28, 2015, that we had sufficiently pled that he had lied on that date when he said that the A-10 was performing as expected, that it's performing well, and that any issues are related to a single OEM. The District Court found that we had pled a strong inference of Scienter with respect to those false statements. The Court also found that we had sufficiently pled that Samsung had rejected the A-10 due to the overheating defect, and the Court had two pages of findings, summaries of our allegations of the Scienter, and everything the Court looked to, the daily reports, the weekly and twice-a-week meetings, the conference calls, the e-mails, all took place between March and December of 2014, and all apply equally to the seven statements before January 28, as they do to the statements on that date, and they apply equally, since this defect was never cured, to the 15 statements afterwards. The District Court made two mistakes. It made a mistake as to loss causation, which erroneously excluded the July 22 corrective disclosures as corrective disclosures, and it erroneously read our complaint as equivocating as to when Samsung had determined to reject the A-10. On loss causation, in fairness to the District Court, the mine workers' decision followed its opinion, but it's clear under mine workers, which clarified and didn't create new law, that the findings that our loss causation allegations failed, quote, because the July 22 disclosure does not reference the A-10's propensity to overheat, and that a plaintiff must, quote, allege that the market learned of and reacted to a fraud are wrong. What mine workers said, and which we did, is that the plaintiff must, quote, trace the loss back to the very facts about which the defendant lied. There are two periods of corrective disclosure. January 20 and 28 deal with the Samsung rejection. The court found we had adequately and plausibly alleged that that was due to the overheating defect. And then we get to the point. But isn't part of your theory that the disclosure didn't say the reason was the overheating defect? That was what the district judge said. Correct. But it seems like it's part of your loss causation theory, isn't it? It seems to me that you have to say in January they said that Samsung is not going to use the chip, but they're not admitting there's a heating problem. The other manufacturers are using the chip, but they're having the heating problem, and the sales are bad because of the heating problem. And so you get to July, and now they say sales are bad. And your theory is that that was all caused by the heating?  So what is your evidence on this theory? I think we have to assume that when they do disclose in July that the sales are bad on the other devices that are using the chip, that the reason is the heating. All right. We begin with an admission by the CFO of Qualcomm on July 22nd. I'm going to quote what he said at the conference call. Quote, devices, quote, other than the leading SKUs, that's other than Apple and Samsung, are not selling through at the levels that customers thought, and certainly some portion of 810 is part of that. But so we know that means heating as opposed to something else? We've pled. If you look at paragraph 285 and paragraph 288 on page 293, there's some duplicate numbering. So it's the paragraph 288 on page 293 that summarized some of those factual allegations. And the market, when the market reacted to July 22, they also attributed it to the overheating defect. So this is a very. You're saying the market, like, the market watchers said that it was because of the overheating? Correct. Exactly right. And, in fact, we know, we know from the OEMs that the overheating problem was real. LG put out a public statement in January that it got a bad batch of chips. In paragraph 182, Sony publicly states this thing is overheating on us. We know that there are private complaints that both Sony and LG are regularly making to Qualcomm. And we also know that independent testing for four of the six OEMs, the LG, the Sony, the, I get the HTC, ZTE, are defective. We have independent tests on that. I apologize that everybody uses initials. I'm in an era when I was used to names. So we actually have pled evidence on that. Now, all we want is discovery. You know, the judge is not sitting as a trier of fact. And he made findings which, with his loss causation mistake, are sufficient to allow us to proceed to discovery. Let me ask you. I'm sorry, go ahead. Oh, no, please, go ahead. Let me ask you about that, because, and I know that ultimately we're going to come back to the difference between a Rule 12 and a Rule 56. But we have the overlay of the PLSRA. And that is this. I see that there's a decline in the stock value on July 22nd of about $2 and change from $64.19 to $61.78. But I also see, and now I know I'm going to take you out of the record a little bit, by the end of 2016, the stock was up above $70. By early part of this year, the stock was down to $55. Recently this year, it was at $90. And as of yesterday, it's at mid-70s. How is the district judge supposed to apply the PSLRA on a loss causation issue at the motion-to-dismiss stage and really say that that decline of $2 and change is attributable, at least in part, to these misrepresentations? The question is whether we factually allege that it is. Now, the PSLRA says you look at the 90-days mean trading average afterwards. I mean, there's a lot that's happened, settlements that they've had with major other issues. So you don't look at an eternal period of time. And it's going to be a matter of contesting experts, right, regression analyses. Maybe we'll lose. Maybe they win at summary judgment. All we're saying, Your Honors, is we're entitled to get to summary judgment. Judge Smith, I think you had a question before. Well, I would just, I think my colleague has pointed out, which you very well know, the PSLRA is a tough vehicle. And here you've got some specific requirements about materiality and loss causation. As I've gone through and parsed the things that you state in your complaint, I'm wrestling with the compliance in both those categories. As you know, when you're doing chips or whatever you're doing and you're developing things, it's not always a straight line up. There are things that go wrong. But the PSLRA does not require that every little hiccup be disclosed. I know it's your view that the overheating here was just a disaster and it needed to be disclosed. But the way that the officers spoke, the things that were said, I'm wrestling with basically what was wrong in the sense of was this a material, was just a flat-out lie? Was it maybe a bit of puffing, a bit of concealing but not out-and-out lies? How would you characterize this? Your Honor, let me start by saying that we understand there are problems in every development. The duty under the securities laws is that when you speak, you don't create, and this is under Kutera and under Burson, an impression of a state of affairs that is different than the real state of affairs. Now, they did not have to say that the A10 is performing well. Well, again, you're a really smart lawyer. I respect you. But we're dealing with a different world after the PSLRA, and I've had, as you know, a lot of cases dealing with this kind of an issue. And some of them I've found for the plaintiffs. Some of them I've found the other way. But, again, you have an executive officer. They have to deal with these folks. They're not going to go out and say the worst possible thing it could possibly be. Nobody's going to do that. The question is whether what they did say is of sufficient materiality and sufficiently false, if you will, or misleading, better word, that it meets the qualification here. Would you agree this is a close one in that category? Your Honor, I agree that that's a tough standard to meet, and some of the statements are tougher than others. I mean, there are statements, a series of statements, that the rumors of overheating are rubbish, unequivocal statements. We have two or three of those. We have a statement by someone named Michelle Layden Lee in response to a question whether it overheats. There's no overheating problem, and we have categorical statements. But, Your Honor. No abnormal thermal issues. Exactly right, Your Honor. I mean, it just depends on the statements. But let's take a look at the other. But, again, within the development area, no abnormal heating. Everybody knows. You've got a computer. You know that it heats. Every computer heats. Every chip heats. The question is whether it's abnormal, right? That's what we're talking about here. Correct. But we're talking about things that are reported to be scalding temperatures of 130 or 150 degrees. And the abnormal thermal issues statement, you've got to look at timing, is after release. I mean, 15 statements are after January 28th, after it's in use. But let's talk about the on-track statements that are before. It's at the same month it's being released, the month before and the month. Those are affirmative denials of a Business Korea story saying that the A10 overheats and it's possible that a Galaxy X6 isn't going to use it. Now, they could have said no comment. They didn't say no comment. They didn't say, I think we're on the right track. They said, we're on track. And every analyst understood that to mean that at least Samsung hasn't rejected it. And if you go back even to November. Again, respectfully, is that really true? I mean, you can have a chip release and you can have some people decide that, you know, say Apple, for example. I'm not saying to try to tie them together, of course. But they say, you know, that their designer says, this chip's too big. It's just too big. We don't need it. We don't want it because we've got to have something else. We've got to have our own design somewhere else. And that would be a situation where the chip's not going to be used. But it wouldn't necessarily be tied to overheating or the amount of overheating. Because, again, at least my understanding and my personal experience is all chips get hot. You're absolutely right, Your Honor. The district court did find that we had plausibly alleged that the Samsung rejection was due to overheating. And LG and Sony specifically complained both publicly and privately about overheating and independent testing. And we're talking about overheating in the context of use in devices. Okay. We may or may not agree on this. But can I just ask you, I don't know how much time you want to say. I want to answer whatever questions you've got. What about the proof of loss element here? Let's assume for a moment that you're correct about your allegations about misrepresentation. Where is your proof of loss? Well, this isn't an evidentiary. The stock price went down, which is the bellwether, 10.58% on January 20 and 28, 3.75%, I believe it was, on July 22. That has to be established evidentially. Right. But these are people that purchased on the basis of the hidden defect. And you believe that you pled that the cause of that drop was because of the misrepresentation from your perspective? The hidden overheating defect was the cause of the loss. That is, we know from the district court's decision, why Samson rejected. That is what we pled as to the other OEMs. It's what they complained about. And it's what the independent expert testing found. If we were more persuaded by the January to July than the earlier part, would that just limit the class period? It would, Your Honor. It would. I do want to say, though. Okay. The last thing I want to say, I want to at least say it a minute and a half, is that the on-track statements could have been no comments. They were not, I think, were on the right track. They are affirmative denials, and they are read that way by the market. Thank you, Your Honors. Thank you, Counsel. Counsel? I'll bet you disagree with him. Your Honor, you must have ESP. Anyway, may it please the Court, why don't I pick up where Counsel left off? Because, you know, I think that it is worth looking at the different periods each for itself. And the comment about the on-track becomes important because, of course, there's no statement about overheating or anything like that. In the earlier period, there's a disclosure that Samsung is going to use their own chip late in January. And, you know, plaintiffs need to have something that was rendered false by that. And the fact is that there's absolutely nothing that Qualcomm or anyone at Qualcomm. I'll say this from an anomalous son of the PSLRA. If Samsung said it's going to use its own chip instead of Qualcomm's and the market is aware of that, would the fact that they were going to use their own chip be enough to sink the market a little bit, whether or not there was a heating problem? Of course, because they're, you know, the most significant customer. So the market would say, perhaps, that Qualcomm's not going to make as much money because Samsung's going to use its own chip, having nothing to do with the heating, so we have a proof of loss problem, right? Well, and, you know, you can quantify it to some extent. Not exactly. I mean, there is when the Samsung news comes out, so that's the loss of a significant customer. That, coupled with other factors, so you can't isolate it, but this puts a ceiling on it, at least, causes Qualcomm in January to, this is it, page 26 of the supplemental excerpts, that they guide expectations downward for the fiscal year by what amounts to about 3 percent. Like revenue, the revenues are around $27 billion, excuse me, and it's around 3 percent of that for the effect of Samsung, plus consolidation in the market going toward the upper tiers, plus. This was Qualcomm's own statement. Yeah. Saying, basically, we're looking into the future here. Samsung's going to use its own chip, and there are various other factors. We projected a drop in our revenues. There's going to be some, certainly, there's some drop if you lose Samsung as a customer for this particular chip, even though Samsung is still buying other chips. So I'm concerned that, after that point, the market doesn't know why Samsung dropped, and it seems to me that Qualcomm makes a lot of statements to try to say it's not because of heating, it's not because of heating, including things like we have, whatever I read earlier, we have no heating problem, repeatedly. Yes. But there, allegedly, was a heating problem. So then you get to July, and there are fewer sales, and why is that not because these people are not buying the cell phone because it's overheating? So, Your Honor, I think those are, obviously, the most important questions here. May I have your permission just to finish briefly addressing the pre-January period, just to address the last thing? Sure. I'm only concerned about after. I'm much more concerned about after January. I understand. I just want to make sure. Just be sure you address her question. Oh, and I will. And, you know, those are important questions. What I wanted to say is, obviously, there was never any statement pre-January that Samsung is going to use our chip. The market may have expected that they would because they had in the past. But, you know, you can look through all the statements. There is none. Counsel is trying to say now that the on-track statements, when they could have said no comment, were actually saying, representing that. But if you look at them, in fact, they did say no comment. Each of those on-track statements is, we are not going to comment on the rumors. We are going to say that it's on track to be released without delay. So they only addressed the delay point because people had said, excuse me, this may be late because of problems. We're saying it is on track to be released, and it was released. There is no statement anywhere that anyone, let alone a reasonable investor, would have taken as saying yes. And the idea that the market understood our statements to that effect, the market had separate expectations. There is nothing where the market said, oh, look, Qualcomm is saying Samsung is actually going to use the chip. Now let me address all your statements. I want to talk briefly about the, you know, the non-loss causation issues, but then spend most of my time on the loss causation issues. On all of those statements, I mean, this is a very odd theory of securities fraud because, you know, as counsel is saying, she's talking about the concealed overheating defect. This is if there is, I mean, there's disagreement over whether it's a defect or not. It's the least concealed defect if it's a defect in the history of securities law because everything out there is responding to all of these, all of this chatter about there is a problem. There are these rumors, but, I mean, are we supposed to assume that the market is supposed to know that when Qualcomm says we have not observed any abnormal thermal issues that they must be lying because they're the rumors? So, no. But what the market would understand, I think, is that, you know, these are devices that are out there, right? People have reviewed them. People have used them, et cetera. Qualcomm's view was there is not a problem with the overheating, of course, is not the chip or the device. It's an interaction. It's what you were trying to make the chip do. It's how the other factors in the design. Qualcomm's view was that and continues to be there's no problem with the chip. You did have to use it correctly. And their opinion was that the chip is not defective. And they expressed that opinion. Looking at the allegations alleged by the plaintiffs, did Qualcomm make any false or materially misleading statements at all? We'll talk about lauscusation later. Did they make any materially misleading statements as alleged? I don't think the case turns on it, but I don't think they did. No, because I think that all of these things saying there is no overheating problem, we think it's functioning the way it's supposed to, is these are all statements of the company's opinion, right? It's not there isn't a sort of. I mean, haven't they alleged enough that it's just false? I mean, so they have these the customers saying we're having overheating problems with your chip. So so I mean, maybe it turns out you can you can show that they're not. That happens with every customer. That always happens. It's always just puffery. They're trying to get a lower price. I mean, maybe you can show that. But isn't that what discovery is? Well, I mean, I think the answer to that is no, because since the question is, is it overheating? Is there a heat issue more than usual? As your honor was saying, there is a heating issue with any computer device or smartphone. Presumably, so customers know that. And yet they were complaining that they had heating problems. Right. And under certain circumstances, any phone or device will get hot there. The opinion they were expressing and there is is there is no abnormal heating issue with the chip. It's a statement of opinion. And then the question is, is there a basis for believing that they didn't believe what they were saying? Knowing that people have complained about their devices getting hot doesn't mean that they didn't believe that. Actually, there was not a problem with the chip. I think anyway, that's what I have to say about that. I mean, there are rumors from like a customer, I mean, an actual individual person. That would be maybe one thing. Maybe the person is just crazy. But these are from the actual companies making the cell phones. Right. Allegedly. Well, I mean, they're mostly not. I mean, there are a couple of things reporting hearsay from various. They're actually, if you go through the complaint, it's mostly not. But, you know, let me talk about loss causation because I think that. Before you get there, following up on my colleague, for purposes of analyzing this under the PSLRA, let's assume for a moment that the Qualcomm executives are looking at the chip based upon the chip itself. Right. And the way it performs vis-a-vis a normal chip, not the way it's necessarily being used by customers. If they say that things are on track in terms of they're going to be released in time, that people are buying it and so on without specifying that Samsung is going to use its own chip, would they be violating the law, making a material misrepresentation, if they spoke of the chip as their understanding of the chip and how it was performing, not how it performs with how it's being used by the customers interacting with other parts of the whatever the device is? Not unless there was evidence that they believed that the chip was not performing appropriately. So, for example, if whatever, let's say Samsung. Say Samsung used a different kind of a chip and say they'd used it before in another device, but this time they put it in a television set and when they hook it up with gadget one, two, three, suddenly it bursts into flame. That doesn't necessarily mean that Qualcomm's chip is bad. It just means that when Qualcomm's chip is combined with the other items, it creates a problem. My question to you is if the Qualcomm executive says it's on track, it's performing basically as we designed it to do, the fact that somebody's having a problem in the way they're using it does not necessarily mean that that's false. Is that correct? That's certainly true. And I should say, I know this is hypothetical, but it's just important to distinguish here, the on-track statements that are alleged here were very specific to on-track to be released. There is no statement that this is on track to, you know, like denying this. But this is a pre-release statement, right? Yeah, it's a pre-release. It's on track to be released. There was no denial of rumors at that time about. Paragraph 176 talks about in June 2015, DoCoMo, the largest carrier in Japan, has placed an overheating warning label on devices with the 810. How do you deal with that? Okay, so one way we deal with that is we actually, I wish I had the citation at hand. Maybe you have it. We mentioned this in the brief. It's in the supplemental excerpts of record. Samsung at the time, I mean, Qualcomm at the time put out something demonstrating that, in fact, that never happened. But, I mean, if all, if these cell phones, I mean, it says these devices included Sony and Sharp. And, I mean, if these devices have a label, you're saying it didn't happen. So that's a fact dispute then, right? They're reporting, I believe, what's the, this is 176. 176 ER251. I'm pretty sure that what they were alleging there was that somebody else reported it. Yeah, ZDNet reported. So that's, they're not, it's not an allegation of fact. It's an allegation that someone else said something, that it happens is incorrect. They haven't put their Rule 11 whatever behind it. And we have actually something that's in the supplemental excerpts that, at the time, demonstrated that there were all these rumors out there. So your position is this warning label was never actually put on these devices? Right. But it's, and that that's not a fact dispute that needs to go further into discovery. It's not alleged. You can't say someone reported this and not allege, that's not an allegation of fact, right? Well, how are they supposed to? They could allege it if it really, if they believed it happened, they could allege it. And, but then they would have to, you know, there's no sanction for alleging that someone else said something. But we don't think it happened. If it did happen, again, that, again, really cuts against their loss causation theories, the idea that there was some secret defect that the market suddenly discovered. Well, but that's like at the same day that Qualcomm is saying there's no heating defect. I mean, so. Right. But the market is not, it's not like the market is, let me try, since I'm running out of time, to briefly get to the loss causation because I think that moots all of these questions. The ways in which the loss causation, multiple ways the loss causation allegations are deficient, even if you assume that they had alleged, which they really hadn't, a sort of first sole or proximate cause approach. Number one, there's a 9B requirement, right? You've got to allege with specificity how there's loss causation, and loss causation means a substantial effect in causing the loss. Here you have a statement from Qualcomm about a lot of things contributing to the lower guidance. They say, well, there's a problem. This must have caused it. There's no allegation of how much these carrier cells, which carriers are at issue, which OEMs are at issue, how much effect they had on Samsung, I keep saying Samsung, on Qualcomm's results, how much higher their sales would have been if not for the alleged defect. Did they need to put all of that in their complaint? Well, you have to at least allege enough to just like on the false statement side, you have to allege the reasons why something is supposedly false, you have to allege something establishing enough reason to believe that the allegations, if true, establish a substantial effect. Here you've got a total black box. Certain unspecified OEMs had a shortfall in sales because we say it's because, not because of the other market factors which we alleged in our first amended complaint, but omitted from the second complaint, but because of this problem that we're seeking to focus on, there's no way of even knowing, even if true, if it was a substantial effect. And then you have the prospect of how are you supposed to determine as a court that in all of these devices, whichever it is that are supposed to be having the effect, that the reasons they didn't sell well is not because Apple and Samsung were designing better, or that the market in China was not what it was expected to be, or because the form factor wasn't as good, their apps weren't as good, their pricing wasn't as good. And that's what experts are for once you have discovery. I'm not sure how they can prove the whole case before they. You don't have to prove the whole case. But this is something, even if it had been alleged, this does not satisfy proximate cause under the federal standard of what proximate cause has to be. You could imagine a case where an OEM had said, you know what, we're not using your chip, and then maybe you could conceive of proving that the reasons they weren't using the chip were because of a thermal defect, not because of pricing or some other goal. But here we're going to a very far next step of saying the OEMs are fine, they're using the chip, but we're going to prove basically that you defrauded the market about the prospects of these people's smartphones and tablets and that the reasons that they didn't compete as well against Samsung and Apple or against whatever other reasons are not because of the way they were designed or priced or marketed. No expert can testify. I mean, a court would have to have not just a bunch of mini-trials, but a bunch of mini-trials that would be impossible to resolve in any, I mean, that's why proximate cause doesn't allow that level of remoteness. I mean, this is so important. I think we're about to go a little bit over time. Do either of my colleagues have any pressing issues? We have lots of pleading on this, lots of briefing. We appreciate all of that, but we appreciate your input and thank you very much. Thank you. Your opposing counsel has some time for rebuttal. About a minute and a half. I won't go over. You know what, we're going to give you an extra minute since we gave him a little time. So you have two minutes and 36 seconds. Thank you very much, Your Honor. Your Honor, first, counsel misargues Rule 11. But Rule 11 says is you also can say, as we do say, that what we say will be provable by discovery when we can have discovery. And when we talk about DOCOMO, you can take a look at what they point to in the record. But, counsel, with respect, I mean, I empathize with you. I empathize with people on a lot of the civil rights suits and so on that we get as well, which, of course, are different than this. What Rule 9 does, it's really tough when you don't have discovery. But it is also true that the Congress has set and the rules have set some very tough standards, very difficult to plead to when you don't know all of the facts. But it is also true that it has to be something that on its face meets these minimum standards, such as laws of causation and proximate cause, all those kinds of things. But, Your Honor, then take a look at TELHEBS. There the PSLRA said you have to plead with particularity a strong inference of Siander. And the court said, the Supreme Court said, well, if it's in equipoise, that's enough. If it's in equipoise, that's enough. Now, we have pled actual facts. And when we're talking about the other OEM sales, I would suggest paragraph 285 and then begin the nine paragraphs, beginning with paragraph 288 on page 293, for the other OEM's sales falling short because of the heating defect. Remember that three of these OEMs had to deal with it. Xiaomi took out five thermal patents. Sony put in a dual pipe to dissipate heat. And LG slathered graphite and gel around it. And nobody tests these chips without devices. Well, they talk about, this complaint talks about testing the chip in devices. The chips have no use outside of devices. They go for commercial release in devices. The only way, they had nine months of a futile exercise to deal with an overheating problem. CW3, who's in charge of the thermal testing, said never in the history of the company is he aware that it ever took more than three months to deal with this. They always have to deal with this. Overheating has a real meaning. Okay. And we've let you go a little bit over here. I'm done. The time is correct, right? Yeah. Did we give him what we said we were going to? Did we give him what we said we were going to? He was a few seconds short, but he's gone over. Okay. All right. I appreciate you would like to say a whole lot more. We know you're an excellent lawyer. We appreciate the briefing by the parties in this case. You did an excellent job. I think it will enable us to do our work. We appreciate your clarification. So we thank you both. This case is submitted. Thank you.
judges: M. Smith, Friedland, Simon